SIG ELLINGSON & COMPANY v. POLK COUNTY STATE BANK OF CROOKSTON AND ANOTHER.

G. P. BAIRD v. POLK COUNTY STATE BANK OF CROOKSTON.[1]

April 22, 1932.

Nos. 28,563, 28,564.

John H. Hougen, for appellant.

F. A. Grady and Lowell J. Grady, for respondents.

[1]Reported in 242 N. W. 626.

PER CURIAM.

Two actions, one by Sig Ellingson & Company, a corporation, against the Polk County State Bank and J. L. Wentzel, and the other by G. P. Baird against the same bank, were tried together. There were findings for the plaintiff Sig Ellingson & Company in the sum of $1,087.90 and in favor of the plaintiff Baird for $412.10, with interest on the first sum from October 9, 1929, and upon the latter sum from October 12, 1929. The defendant Polk County State Bank appeals from the orders denying its motions for a new trial.

The defendant Wentzel was a stock buyer in Polk county. Sig Ellingson & Company was a corporation doing a commission business at the stockyards in South St. Paul. On October 8 or 9, 1929, Wentzel drew a sight draft against Ellingson & Company on the Stock Yards National Bank of South St. Paul in favor of the defendant Polk County State Bank for $1,500. The draft was sent by the Polk county bank, and the money returned by the South St. Paul bank to the Polk County State Bank, and was credited to Wentzel's account on October 11, 1929. Wentzel was indebted to the Polk county bank on overdue notes in an amount exceeding $1,500. On October 12, 1929, the bank notified Wentzel by mail that it had charged off the notes against his account, leaving nothing or substantially nothing in it.

After the check was deposited to Wentzel's account he issued checks for stock bought to be shipped to Ellingson & Company amounting to $412.10. The defendant bank refused payment. The plaintiff Baird received one of the checks. A number of others, similarly situated, who had received checks assigned their claims to Baird, and he brought suit on his own and the assigned claims. They amounted to $412.10. The amount claimed by Ellingson & Company, $1,087.90, is the balance of the $1,500.

Mr. Justice Loring, having been counsel for the defendant in the court below, took no part. Mr. Chief Justice Wilson, Mr. Justice Stone, and Mr. Justice Olsen are of the view that there can be no recovery by either of the plaintiffs. Mr. Justice Holt, Mr. Justice

Dibell, and Mr. Justice Hilton are of the view that the plaintiffs should recover the amount fixed by the trial court.

The rule, in which all agree, is that when a member of the court is disqualified and the other members are equally divided the order from which the appeal was taken will be affirmed. Wilson v. Jamison, 36 Minn. 59, 29 N. W. 887, 1 A. S. R. 635; Nelson v. M. & St. L. Ry. Co. 41 Minn. 131, 42 N. W. 788; Gran v. Spangenberg, 53 Minn. 42, 54 N. W. 933; State v. Corrivau, 93 Minn. 38, 100 N. W. 638; Jordan v. N. W. Elec. Equipment Co. 117 Minn. 522, 134 N. W. 1134; Lutzer v. St. Paul Table Co. 121 Minn. 254, 141 N. W. 115; Foley Bros. v. County of St. Louis, 158 Minn. 320, 197 N. W. 763; Polin v. St. Paul Union Depot Co. 159 Minn. 410, 199 N. W. 87; Day v. Day, 180 Minn. 151, 230 N. W. 634; 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 290.

Orders affirmed.

WILSON, C. J.

Of course I concur in the rule stated, to the effect that when one justice of the court is disqualified and the others are equally divided the order of the trial court will be affirmed. But I think the opinion should disclose the conflict and the respective views. I am unable to state the grounds or reasons why anyone thinks there should be a recovery. I will state some of the reasons in opposition to a recovery.

Sig Ellingson & Company were brokers or commission men engaged in receiving and selling cattle for others for a commission on the South St. Paul market. Wentzel was engaged in the business of buying and selling cattle on his own account at or near Crookston, Minnesota. After buying the cattle for himself he shipped them to Sig Ellingson & Company at South St. Paul, and they sold the cattle for him and charged him a commission for such sale.

As I construe the record, the transaction between Ellingson & Company and Wentzel was merely a loan of money by the former to the latter, and when the latter received the money it was his.

When he deposited it in the bank the money became the bank's money, and Wentzel was its creditor.

In my judgment the bank had the legal right to apply the deposit on Wentzel's indebtedness to the bank. Whether the bank's conduct in so doing was harsh is not to the point for our consideration. The deposit was in no sense a trust fund.

I think the record clearly establishes that the cattle which Wentzel bought with money lent by Ellingson & Company were his cattle and not the cattle of Ellingson & Company. In fact, Wentzel borrowed money from time to time from Ellingson & Company to be used in his business as cattle buyer. He would ship his cattle to Ellingson & Company at South St. Paul, and they would sell the cattle, sending Wentzel sales sheet showing gross receipts and amount paid out for freight, yardage charge, feed, weighing, insurance, and inspection, and finally the commission of Ellingson & Company. After deducting these amounts, Ellingson & Company would also deduct such amount as they had theretofore advanced to Wentzel. Certainly Ellingson & Company would not charge Wentzel a commission for selling their own cattle. Indeed, Wentzel himself testified as follows:

Q. "You stated on direct examination that when the Red River Valley Bank of Fisher was open you borrowed money from them for the purpose of negotiating these stock purchases and sales. Is that correct?

A. "Yes.

Q. "Later on, when that bank closed, from whom did you borrow money?

A. "Sig Ellingson Company.

\* \* \* \* \* \*

Q. "And this method of drawing sight drafts was simply a method of the Sig Ellingson Company in advancing money to you, was it not?

A. "Yes.

Q. "And so it was a loan on your part from them?

A. "A loan to help me along in business.

Q. "To purchase these cattle?·

A. "Yes."

Moneys so borrowed from Ellingson & Company were not the only funds deposited in Wentzel's account with the Polk County State Bank. He carried all his business in that account, and he drew on it for all his business and personal expenses. The funds so carried in this account were a mixture of moneys raised from various sources as well as from Ellingson & Company.

STONE and OLSEN, JJ.

We concur in the above.

DIBELL, J.

All agree that the orders under review should be affirmed upon an equal division of opinion and that no precedent is made. The cases cited in the per curiam so hold. It was the rule at common law. It is everywhere held. Dec. Dig. Appeal and Error, § 1123. Nothing we say further is of judicial consequence.

There can be no dissent by a majority. There can be no dissent when there is an equal division. There can be a dissent only by a minority. The practice is to state the result and refrain from commenting upon the merits of opposing claims. Thus in the first case cited, Wilson v. Jamison, 36 Minn. 59, 62, 29 N. W. 887, 888, 1 A. S. R. 635, Mr. Justice Dickinson, referring to the fact that there could be no final decision of any principle, said:

"We forbear from any discussion of the subject in this opinion."

In Nelson v. M. & St. L. Ry. Co. 41 Minn. 131, 42 N. W. 788, Mr. Justice Mitchell directed an affirmance because of a division of opinion with no comment. In Gran v. Spangenberg, 53 Minn. 42, 54 N. W. 933, Chief Justice Gilfillan adopted the same practice. In State v. Corrivau, 93 Minn. 38, 100 N. W. 638, where Mr. Chief Justice Start wrote the opinion on a motion to dismiss an appeal, the same thing was done. In Jordan v. N. W. Elec. Equipment Co. 117 Minn. 522, 134 N. W. 1134, there was a per curiam opinion without comment. In Lutzer v. St. Paul Table Co. 121 Minn. 254,

258, 141 N. W. 115, 117, Mr. Justice Bunn, referring to the division of opinion and the necessary affirmance, said:

"It would be profitless to discuss either the extent of plaintiff's loss or the precedents."

In Foley Bros. v. County of St. Louis, 158 Minn. 320, 322, 197 N. W. 763, 764, Mr. Justice Holt said:

"Both sides have fully argued their views to their associates without a resultant change of view. The finding of the trial court is therefore sustained on a division of opinion. It is unnecessary to state the individual views of the court. They carry no weight. No precedent is made. There is no opinion in which to concur and no decision from which to dissent."

In Polin v. St. Paul Union Depot Co. 159 Minn. 410, 199 N. W. 87, and Day v. Day, 180 Minn. 151, 230 N. W. 634, both written by Judge Taylor, there were affirmances without individual comments by the justices. In the Foley case, 158 Minn. 320, 197 N. W. 763, there was a dissent. There are found occasional expressions of the views of the justices when a majority are unable to agree.

In Etting v. Bank of the U. S. 11 Wheat. (U. S.) 59, 77, 6 L. ed. 419, Chief Justice Marshall said:

"In the very elaborate arguments which have been made at the bar, several cases have been cited which have been attentively considered. No attempt will be made to analyze them, or to decide on their application to the case before us, because the judges are divided respecting it. Consequently, the principles of law which have been argued cannot be settled; but the judgment is affirmed, the court being divided in opinion upon it."

No argument is sought to be made in support of the conclusion reached by the trial court. Some facts, either undisputed or such as could be found, are noted. The arrangement that the Ellingson company should advance money through the defendant was made as early as January, 1929, and continued until Wentzel's account was applied on his individual indebtedness to the bank in October, 1929.

There were some 20 similar drafts and remittances to pay for stock. Wentzel talked with the officers of the bank. To one of them, the exact date not fixed, he said:

"Well, I just went in and talked to him and asked him what would be the best way to handle it to get the money back, and he said draw a draft, that would be about the best way. He would make out the draft and I would sign my name."

And further, apparently referring to a time just prior to the transaction out of which the present trouble arose, he said:

"I told him (one of the officers of the bank) I was buying cattle and I had to have money here on Saturday (the shipping day) to take care of the checks when they came in."

October 12, 1929, was Saturday. On October 9, 1929, Wentzel signed the draft for $1,500. It was prepared and apparently sent by an officer of the bank. The bank got the returns on the draft, directly from the South St. Paul bank, on October 11, 1929. On the next day, Saturday, the 12th, the cashier wrote Wentzel that it was applying his deposit account on his notes owing the bank, that "any checks coming in Monday will be turned down and not paid"; and that the directors had ordered him to take this action. His statement was that they had been after him a long while. Wentzel delivered the checks to the farmers, except perhaps two, on Saturday. The book entry showing the offset bears date of Monday, which was the 14th. The checks, some six or seven in number, given by Wentzel to the farmers and accepted by them in payment of their stock, were not paid. Some stock was shipped to Ellingson and the net proceeds of its sale applied on the $1,500. The claim of the farmers on the checks and the claim of Ellingson, after deducting the amount of stock which he received, make up the $1,500.

The trial court might have thought the testimony of the bank's officers evasive and not frank. It cannot be charged with an indulgence in speculation if it inferred that when the bank got the $1,500 it intended it would be used as an offset of the old note and knew that the farmers might get checks for their stock and that

if they did their checks would not be paid; and knew that the Ellingson company, which sent the money to be deposited in the bank to meet stock payments, money sent on a draft which one of the defendant's officers helped make, after Wentzel had told the bank that he must have the money on Saturday to pay for the stock, would not be used for that purpose or returned to the Ellingson company; and it could believe that the understanding between Wentzel and the bank and the South St. Paul broker was definite that these moneys were to be used for the specific purpose of paying the farmers for the stock they sold.

The trial court may have thought there was support in the result reached from the principle applied in Agard v. Peoples Nat. Bank, 169 Minn. 438, 211 N. W. 825, 50 A. L. R. 629, and Berg v. Union State Bank, 179 Minn. 191, 229 N. W. 102. In short, Judge Watts may have concluded that it was a surely established fact that the bank participated in the drawing of the draft on the South St. Paul bank; that the money came from the Ellingson company; that it was put into the account of Wentzel, the bank knowing and substantially assenting that it was to be used by Wentzel in paying for stock that he was buying from the farmers about; that the Ellingson company intended such use only; that the money was needed on Saturday, which was the selling day; and that here was the favorable opportunity, whether accidental or created, of making the offset. And the trial judge may have concluded that no bank within his district should be allowed to get money in such a way and for such purposes and apply it on another debt. The views of those who differ, but not a majority, have our utmost respect, as they should have. It cannot be said judicially that they are not right. Assuming Judge Watts' views were along the lines suggested, our view would permit an affirmance on the merits. As it is, we join in affirmance on an equal division. What goes before is a narration rather than an argument; and as either it can have no judicial significance.

Holt and Hilton, JJ.

We concur in the view stated by Mr. Justice Dibell.